**Dr. Ivylyn DAVIS–BELL, Plaintiff,**

v.

**COLUMBIA UNIVERSITY; Dr. Lee Bollinger, President, Columbia University; Dr. Ira Lamster, Dean, Columbia University School of Dentistry; Dr. Richard Lichtenthal, Chairperson, Columbia University School of Dentistry; Professor Stephen Marshall, Associate Dean of Extramural Affairs and Administrative Supervisor, Morningside Dental Clinic; and Dr. Lee Goldman, Vice President, Health and Biomedical Sciences, Defendants.**

No. 10 Civ. 4362(CM).

United States District Court, S.D. New York.

March 19, 2012.

---

Sacha Ann–Marie Comrie, Law Offices Of Comrie & Associates, PLLC, Brooklyn, NY, for Plaintiff.

Kristine Kathryn Huggins, Susan Deegan Friedfel, Proskauer Rose LLP, New York, NY, for Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

### INTRODUCTION

On June 2, 2010, Plaintiff Dr. Ivylyn Davis–Bell ("Plaintiff") filed this action against Columbia University and numerous individuals affiliated with it—Dr. Lee Bollinger, Dr. Ira Lamster, Dr. Richard Lichtenthal, Professor Stephen Marshall, and Dr. Lee Goldman (collectively, "Defendants")—alleging that they subjected her to a hostile work environment, discriminated against her by failing to promote her, and retaliated against her on the basis of her race and gender in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq.; 42 U.S.C. § 1981 ("§ 1981"); the New York State Human Rights Law ("NYSHRL"), NY. Exec. Law § 296, et seq.; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8–107(1)(a).

Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56, The motion is GRANTED and the complaint is dismissed.

### BACKGROUND

In response to Defendants' 56.1 Statement, Plaintiff filed a 56.1 Statement that does not comply with this district's local rules, Local Civil Rule 56.1(b) requires that "The papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party."

Instead of following these rules, and using "correspondingly numbered paragraphs" (113 total in Defendants' 56,1 Statement), Plaintiff filed a "56.1 Statement" that contained only 12 numbered paragraphs, filled with unhelpful statements and cherry-picked allegations of facts that failed to correspond or respond to Defendants'. This failure means that the material facts in Defendants' Local Civil Rule 56.1(a) statement are deemed admitted as a matter of law. *See* Local Rule 56.1(c); *Hi Pockets, Inc. v. Music Conservatory of Westchester, Inc.,* 192 F.Supp.2d 143, 147 (S.D.N.Y.2002) (McMahon, J.).

Nonetheless, the Court has conducted an independent review of the record, and confirmed that the facts set forth below undisputed. *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) ("While a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement.") (internal quotations and citations omitted).

### I. The Parties

Plaintiff is an African–American woman employed by Columbia University since 1999 at the Morningside Dental Clinic. (Compl. ¶ 1; Defs.' Rule 56.1 Statement ¶ 9.)

Defendant Columbia University ("Columbia University" or "Columbia") operates the Morningside Dental Clinic, which is affiliated with Columbia's School of Dentistry. (Compl. ¶ 2.)[1]

---

1. Defendants aver that "The Trustees of Columbia University in the City of New York," and not Columbia University, are technically

Defendant Dr. Lee Bollinger ("Dr. Bollinger") is the President of Columbia University. (*Id.* ¶ 3.)

Defendant Dr. Ira Lamster ("Dr. Lamster") is the Dean of the Columbia University School of Dentistry. (*Id.* ¶ 4.)

Defendant Dr. Richard Lichtenthal ("Dr. Lichtenthal") is the Chairman of Adult Dentistry at the Columbia University School of Dentistry. (*Id.* ¶ 5.)

Defendant Dr. Stephen Marshall ("Dr. Marshall") is currently the Associate Dean of Extramural Affairs, and was the Administrative Supervisor of the Morningside Dental Clinic. (*Id.* ¶ 6.)

Defendant Dr. Lee Goldman ("Dr. Goldman") is the Vice President of Health and Biomedical Sciences at Columbia University. (*Id.* ¶ 7.)

## II. Plaintiff's Work History

Plaintiff's tenure at Columbia began in 1999, when she was hired on a part-time basis as an Instructor in Clinical Dentistry within the Division of Operative Dentistry. (Defs.' 56.1 Statement ¶ 9.) Plaintiffs responsibilities included providing patient care and supervising the patient care activities of the residents at the Morningside faculty practice three days per week. (*Id.* ¶ 10.) In October 2000. Plaintiff became a full-time employee, working four days per week. (*Id.* ¶ 11.)

In 2005, Plaintiff was asked to take on the role of Assistant Director of the Morningside practice in addition to her patient care responsibilities and supervision of the residents. (*Id.* ¶ 12.) Her administrative responsibilities also included setting the schedules for dental assistants and faculty. (*Id.* ¶ 13.)

Plaintiff reported directly to Dr. Stephen Marshall with regard to issues related to the Morningside faculty practice,

beginning at an unspecified time in 2006, and continuing until June 2008. (*Id.* ¶ 15.) At that time, Dr. Marshall was responsible for overseeing the functioning of all of the faculty practices of the Columbia Dental School. (Aff. of Kristine K. Huggins in Supp. of Defs.' Mot for Summ. J. ("Huggins Aff.") Ex. 5 ("Marshall Tr.") 10:14–11:25.)

Plaintiff was promoted to the title of Assistant Professor of Clinical Dental Medicine effective July 1, 2008, a title she continues to hold along with the title of Assistant Director of the Morningside practice. (Huggins Aff. Ex. 4 ("IDB Tr.") 23:9–14; Huggins Aff. Ex. 8.)

## III. Plaintiff's August 2006 Interactions with Debra Cascardo

Plaintiff's troubles began in August 2006. Debra Cascardo ("Cascardo") was a part-time consultant at the Morningside practice from July 2006 to October 2006. (*Id.* ¶ 17.) It was her responsibility to act as Interim Practice Administrator for the Morningside practice, and offer recommendations to improve the management and operations of the practice going forward. (*Id.* ¶ 18.) Cascardo was never an employee of Columbia University, and did not have any authority with respect to faculty termination or placement (*Id.* ¶¶ 19–20.)

On August 24, 2006, a Morningside staff member discovered that some cash and checks were missing from envelopes at the front desk. (*Id.* ¶ 21.) Because Plaintiff was Assistant Director of the practice at that time. Cascardo spoke with her about the missing funds. (IDB Tr. 194:10–13.)

On August 25, 2006, Plaintiff emailed Dr. Marshall and informed him that Cascardo had accused her of aiding a staff member in "illegal activities and fraud."

---

the defendant in this case. (*See* Defs.' 56. 1 Statement at 1.) I assume that the university

corporation is "The Trustees of Columbia University in the City of New York."

(Huggins Aff. Ex. 20.) She said that the statement was made in listening range of patients, faculty, and staff, and that Cascardo claimed that Dr. Marshall "had knowledge of these incidents." (*Id.*) Plaintiff noted that Cascardo made "similar comments" to a different staff member. Plaintiff's email stated that Cascardo's harassment, shouting, condescending attitude, demeaning tone, and at times vulgar language has been tolerated by [Plaintiff] and members of the staff." (*Id.*) Plaintiff complained that Cascardo stated that Dr. Marshall authorized Cascardo to "clean house" and that he made Cascardo "the person in charge of the office." (*Id.*)

During her deposition, Plaintiff also claimed that Cascardo told Plaintiff during their August 24, 2006 altercation that "the University and herself did not like blacks." (IDB Tr. 199:23–24.) Plaintiff did not mention this statement in her email to Dr. Marshall the following day recounting the event, (Huggins Aff. Ex. 20), in her lawyer's March 31, 2008 letter to Dr. Bollinger, (Huggins Aff. Ex. 21), in her complaint to the U.S. Equal Employment Opportunity Commission ("EEOC"), (Huggins Aff. Ex, 2), or in her Complaint in this case. Plaintiff also did not submit an affidavit from anyone who heard the alleged epithet. This is especially curious in light of the fact that Plaintiff claims that this statement was made in the hallway at the same time that Cascardo allegedly accused Plaintiff of having misappropriated funds, which Plaintiff asserts were made in front of Dr. Low and "Karima," and in listening range of patients, faculty, and staff. (IDB Tr. 191:4–14; Huggins Aff. Ex. 24 (email from Plaintiff to Dr. Marshall).)

Cascardo filed her report on the missing funds on August 27, 2006, and stated that she "wan [sic] to make it clear in this incident report that [Cascardo was] not accusing anyone since [she doesn't] know what was supposed to have been done with the envelopes...." (Huggins Aff. Ex. 21 at 2.) Cascardo addressed this report to Dr. Marshall and Sara Patterson, Associate Dean for Finance, and emailed a copy to Plaintiff. (Defs.' 56.1 Statement ¶ 23; Huggins Aff. Ex. 21.)

In response to Plaintiff's email, Dr. Marshall offered to meet with Plaintiff to discuss the incident. (Marshall Decl. Ex. A; Huggins Aff. Exs. 22 & 23.) Plaintiff and Dr. Marshall met on September 7, 2006 and discussed her concerns about Cascardo. (Defs.' 56.1 Statement ¶ 25; Huggins Aff. Ex. 24.) In addition to discussing the alleged accusations of fraud, Plaintiff testified that she also told Dr. Marshall about Cascardo's comment about "not liking blacks." (IDB Tr. 190:16–191:24.) In this meeting, Dr. Marshall apologized for Cascardo's behavior, assured Plaintiff she was not being accused of anything, and informed Plaintiff that he had spoken with Cascardo about the need to be respectful in her communications with Plaintiff and others. (Defs.' 56.1 Statement ¶ 26; Huggins Aff. Ex. 5 ("Marshall Tr.") 82:3–12; IDB Tr. 191:19–25.)

## IV. The April 18, 2007 Incident With Dr. Marshall

The next incident occurred on the morning of April 18, 2007, when Dr. Marshall visited the offices of the Morningside practice. During his visit, he noticed that a number of light bulbs were out in the office waiting room, that there was a large bag overflowing with garbage in the back office, and that the carpet in the hallway was dirty. (Defs.' 56.1 Statement ¶ 27–28.) Dr. Marshall stopped into the room where Plaintiff was working with a patient and her dental assistant, had a brief conversation with her about the dirty state of the carpet, and said that it needed to be cleaned. (Defs.' 56.1 Statement ¶ 29; IDB Tr. 41:8–42:12; Marshall Tr. 26:11–13.)

The parties dispute whether Dr. Marshall asked Plaintiff personally to clean the carpets, or whether the comment simply suggested that the floors needed to be cleaned. After this exchange, Dr. Marshall left the room. Dr. Marshall also later asked Dr. Rinku Saini ("Dr. Saini")— another dentist and faculty member at the Morningside practice, who is male and not African–American—about the overflowing garbage. (Defs.' 56.1 Statement ¶ 60; Marshall Decl. Ex. B.)

Shortly after this interaction, Plaintiff excused herself from her patient and went to the office waiting area where Dr. Marshall was and asked if she could speak with him before he left the offices that day. (Defs.' 56.1 Statement ¶ 32.) Plaintiff then returned to treat her patient. (IDB Tr. 45:22–23.)

Later that day. Plaintiff and Dr. Marshall met together in the private faculty office. (Defs.' 56.1 Statement ¶ 33.) Dr. Saini was present in the private office during this meeting. (Id. ¶ 34.) Dr. Saini offered to leave the room, but Plaintiff asked him to stay as a witness. (IDB Tr. 50:16–19.) Plaintiff told Dr. Marshall that she felt it was inappropriate for him to ask her about the dirty floors in front of her patient and dental assistant. (Defs.' 56.1 Statement ¶ 35.) At that point, Dr. Marshall slammed the door, raised his voice, and said something akin to "it's a fucking shame that so many people work in this office and no one can change a light bulb." (Id. ¶ 36.) Plaintiff told Dr. Marshall he should not be cursing at her and ended the meeting, (Id. ¶ 37.) Plaintiff was upset after her interaction with Dr. Marshall, dismissed her patient, and went back to the private office to write up the patient's chart. (Id. ¶ 38.)

A brief time later, Dr. Marshall returned to the private office to speak with Plaintiff. (Marshall Tr. 28:11–13; Marshall Decl. Ex. B.) The parties differ on what occurred next. Plaintiff claims that Dr. Marshall "slammed" the door and began screaming at Plaintiff, but does not remember what he said. (IDB Tr. 56:6–9.) She claims that Dr. Marshall blocked her exit, and that he only left after she threatened to—and then did—dial another doctor's office. (IDB Tr. 56:10–57:8.) She also claims that she was in the room with Dr. Marshall for approximately 10 minutes. (IDB Tr. 101:7–1 1.) Dr. Marshall claims that he walked into the private office and that, before he could say anything to Plaintiff, she told him not to block the door, that she was uncomfortable, and asked him to leave. (Marshall Tr. 29:2–21.) He stated that he did so immediately. (Id.) This dispute is not material for the purposes of this motion, and I will assume that Plaintiffs version of the events is accurate.

After Dr. Marshall left the office, Plaintiff testified that she called Dr. Lichtenthal, Chairman of the Section of Adult Dentistry, She averred that she left a message with his secretary, stating that she wanted to speak with Dr. Lichtenthal about an incident that had just occurred with Dr. Marshall. (IDB Tr. 57:17–25.) Dr. Lichtenthal never received this message. (Huggins Aff. Ex. 7 ("Lichtenthal Tr.") 16:15–25.)

At some unspecified point, Linda Long ("Long"), a female African–American dental assistant, heard from another dental assistant that Dr. Marshall was yelling at Plaintiff. (Sacha A. Comrie Affirm. in Opp'n to Defs.' Mot. for Summ. J. ("Comrie Affirm.") Ex. I ("Long Aff.") ¶¶ 1–2.) Long sought permission from her supervisor to head to Plaintiff's facility. (Id. ¶ 2.) When she arrived, Plaintiff was crying and appeared upset, and told Long that her left arm was feeling numb. (Id. ¶ 3.) Upon seeing Long, Dr. Marshall, began to yell, "What are you doing over here? You

don't belong here! Get back over to your office!" (*Id.* ¶ 4.) Less than 10 minutes later, Dr. Marshall saw Long still with Plaintiff, and yelled, "You're still here? I thought I told you to get out of here! Go back to your office!" (*Id.* ¶ 5.)

The parties agree that Dr. Marshall did not say anything related to Plaintiff's race or gender at any time during his interactions with her on April 18.2007. (Defs.' 56.1 Statement ¶ 42; IDB Tr. 60:2–61:6.)

After he left the private office, Dr. Marshall typed up what had occurred that morning and emailed it to himself, (Defs.' 56.1 Statement ¶ 43; Marshall Decl. ¶ 5, Ex. B.) Dr. Marshall forwarded his email later in the day to Dr. Ira Lamster, Dean of the College of Dental Medicine, and Associate Dean Sara Patterson, to report the event (Defs.' 56.1 Statement ¶ 44.)

Dr. Marshall emailed Plaintiff the following day. He apologized for cursing, acknowledged that it was unprofessional, and stated that he hoped that they would be able to move forward to deal with the issues facing the Morningside practice. (Defs.' 56.1 Statement ¶ 45; Huggins Aff. Ex. 10; IDB Tr. 61:14–16.) Plaintiff did not respond. (IDB Tr. 61:17–18.)

On May 5, 2007, Plaintiff sent a letter dated April 30, 2007 to the President of Columbia University, Dr. Bollinger, with a copy to Dr. Goldman, recounting her recollection of her interactions with Dr. Marshall on April 18, 2007. (Defs.' 56.1 Statement ¶ 46; IDB Tr. 63:9–25; Huggins Aff. Ex. 11.) The letter did not include any reference to her race or gender or otherwise indicate that Plaintiff felt Dr. Marshall's actions were motivated by discriminatory animus. (Defs.' 56.1 Statement ¶ 47; IDB Tr. 225:24–226:12; Huggins Aff. Ex. 11.)

Dr. Lamster subsequently received a copy of this letter and reached out to Plaintiff to schedule a meeting to discuss the events described in the letter. (Defs.'

56.1 Statement ¶ 48.) Plaintiff did not receive a response from Dr. Bollinger or Dr. Goldman. (*Id.* ¶ 61.)

Plaintiff met with Dr. Lamster on May 22, 2007 to discuss the April 18, 2007 incident. (*Id.* ¶ 49; IDB Tr. 78:24–79:3.) During their meeting, Plaintiff told Dr. Lamster how Dr. Marshall had asked her about the dirty floor and also that Dr. Marshall had cursed at her. (IDB Tr. 77:11–22; Huggins Aff. Ex. 6 ("Lamster Tr.") 40:5–42:12.) Plaintiff did not indicate at this time that she believed Dr. Marshall's conduct was motivated by her race or her gender. (Defs.' 56.1 Statement ¶ 51.)

After his meeting with Plaintiff, Dr. Lamster spoke with Dr. Marshall regarding the impropriety of his behavior on April 18, 2007 and the need for Dr. Marshall to interact in a professional manner with everyone in the work environment. (*Id.* ¶ 55; Lamster Tr. 50:12–21; Marshall Tr. 33:8–17.) Dr. Marshall assured Dr. Lamster it would not happen again. (Defs.' 56.1 Statement ¶ 56; Lamster Tr. 54:15–55:14.) Dr. Lamster also cautioned Dr. Marshall that any further incidents might require Dr. Lamster to take further disciplinary action. (Defs.' 56.1 Statement ¶ 57; Lamster Tr. 50:19–21.)

Following the meeting, Dr. Lamster sent Plaintiff a letter recounting what they had discussed. (*Id.* ¶ 52; Huggins Aff. Ex. 14.) The letter stated that Dr. Lamster spoke with Dr. Marshall about the incident, and claimed that Dr. Marshall was "clearly sorry that he had lost his temper" and that Dr. Marshall "assured [Dr. Lamster] that there will not be a recurrence of this behavior." (Huggins Aff. Ex. 14.)

## V. The Dispute Regarding Plaintiffs Use of Vacation Days.

During the 2006–2007 academic year, in connection with his responsibility for over-

sight of the faculty practices of the Dental School, Dr. Marshall became responsible for keeping track of vacation days used by faculty members, including the faculty practitioners at the Morningside practice. (Defs.' 56.1 Statement ¶ 63.) Steven Harris, Administrator in the Section of Adult Dentistry, asked Dr. Marshall in April 2007 to provide an accounting of the vacation days used by each of the faculty members at all of the faculty practices during the 2006–2007 fiscal year. (*Id.* ¶ 64.)

Dr. Marshall reviewed the records of vacation days used by each faculty practitioner. (*Id.* ¶ 65.) Because Dr. Marshall did not have a complete record of all requests for time off, he had to pull information from various sources to identify the days on which faculty members were not in the practice. (*Id.* ¶ 67–68.) Based on the information available to Dr. Marshall, it appeared to him that Plaintiff had used more than the number of vacation days allotted to her. (Defs.' 56.1 Statement ¶ 74.)

On the morning of June 6, 2007, Dr. Marshall emailed Plaintiff about the dates on which it appeared to him Plaintiff had been absent from the practice and asked her for clarification regarding certain dates. (*Id.* ¶ 69.) Plaintiff did not immediately respond. (IDB Tr. 124:21.)

Later that day, Dr. Marshall was at the Morningside practice for a scheduled office staff meeting and went into the private faculty office. (*Id.* ¶ 70.) Plaintiff was in the office at that time and, when she saw him, told him that she did not want to be in the office with him. (*Id.* ¶ 71.) Plaintiff claims that Dr. Marshall was angry and that he "threw a piece of paper on the desk." (IDB Tr. 95:12–18; Marshall Tr. 47:8–23.) Plaintiff then called the front desk, and Stacey Prince, a dental assistant, went back to the private office to see what Plaintiff needed. (Defs.' 56.1 Statement ¶ 72.) Dr. Marshall told Ms. Prince that

he was trying to give Plaintiff the email, and left the office. (*Id.* ¶ 73.)

Dr. Marshall communicated his concerns regarding Plaintiff's use of vacation days to Dr. Lichtenthal, and Dr. Lichtenthal then set up a meeting with Plaintiff (*Id.* ¶ 75–76.) Dr. Lichtenthal met with Plaintiff on June 18, 2007, during which they discussed the interpersonal conflict that had developed between Plaintiff and Dr. Marshall, in addition to the issue of Plaintiffs vacation days. (*Id.* ¶ 77.) Plaintiff claimed during her deposition that she told Dr. Lichtenthal that, "this seems to be a boys [sic] club", that she understood that she was "a minority in this group," and that "as a minority [she does] believe that [she is] not being treated fairly." (IDB Tr. 86:6–87:13, 127:18–19.) There is no evidence in the record that these comments were communicated by Dr. Lichtenthal to anyone else.

Following their June 18 meeting, Dr. Lichtenthal sent Plaintiff a letter reiterating what had been discussed at the meeting. (*Id.* ¶ 78; Huggins Aff. Ex. 16.) The letter mentioned Plaintiff's vacation days and interpersonal issues with Dr. Marshall and asked her to provide an accounting of her vacation days—it did not reference any complaint by Plaintiff that she was treated unfairly because she is a minority. (*Id.* ¶ 78.) Plaintiff sent Dr. Lichtenthal a response, providing additional information regarding her days out of the office. (*Id.* ¶ 79; Compl. Ex. B.) Dr. Lichtenthal testified that Plaintiff was not in violation of Columbia's vacation policy. (Lichtenthal Tr. 18:16–23.) Plaintiff had no further interactions with Dr. Lichtenthal about her vacation time. (Defs.' 56.1 Statement ¶ 80.)

After June 6, 2007, Plaintiff and Dr. Marshall had no further objectionable interactions, (*id.* ¶ 81), although Plaintiff accuses Dr. Marshall of fabricating Plaintiff's

time sheet: "When Dr. Marshall and his colleagues were unable to find a reason to have me terminated, Dr. Marshall fabricated, fabricated my time sheet." (IDB Tr. 118:14–17.) Plaintiff neither specifies when it happened, nor provides any other form of evidence, such as fabricated time sheets, to support this allegation.

Dr. Marshall remained Plaintiffs supervisor until June 2008, when Dr. Marshall ceased to be responsible for the faculty practices. (Defs.' 56.1 Statement ¶ 15; Marshall Tr. 12:10–18.)

## VI. Plaintiff's Lawyer Sends a Letter to Columbia on March 31, 2008

On March 31, 2008, Plaintiff's lawyer sent another letter to Columbia University, addressed to Dr. Bollinger, concerning Plaintiffs 2007 altercations with Dr. Marshall. (*See* Huggins Aff. 31.) The letter does not allege any form of racial or gender discrimination, (Defs.' 56.1 Statement ¶ 95), but complains that these events were orchestrated to "deprive [Plaintiff] of her retirement benefits for which she will become eligible in approximately 15 months," (Huggins Aff. Ex. 31 at 1.)

## VII. Plaintiff's Promotion to Assistant Professor of Clinical Dentistry

Defendant's "guidelines for appointments and promotions" contemplates a two part review for promotion. (*See* Huggins Aff. Ex. 17 at DB2513.) First, the employee must spend a certain amount of time in his or her position before being considered for promotion to the next rank—two years, for a full instructor like Plaintiff, (*Id.* (there are certain exceptions to the amount of time that one must remain one's their position, but none of these exceptions appears relevant here, and the parties do not argue that they are).) Second, the "individual's professional development and effectiveness in the discharge of his/her responsibilities will be assessed." (*Id.*)

Dentists in Plaintiff's position are not automatically promoted. Generally, the faculty member seeking promotion initiates the promotion process by submitting his or her paperwork to Dr. Lichtenthal, including, among other things, a current resume and three letters of recommendation. (Lichtenthal Tr. 45:11–16; Huggins Aff. Ex. 17 at DB2513–14.) Alternatively, a superior, like Dr. Lichtenthal, could initiate the promotion process. (Lichtenthal Tr. 46:15–18.) Dr. Lichtenthal stated that he would contemplate initiating the promotion process when he had cause to review personnel files, if someone else was promoted, *or if he was asking someone to teach another course or take on more responsibility*. (*Id.* 46:18–47:3.) When one of these events occurred, Dr. Lichtenthal would review the employee's files to determine whether his or her experience met the requirements for promotion. (*Id.*) If it did, Dr. Lichtenthal would speak with the employee and discuss applying for a promotion. (*Id.*)

Plaintiff did not initiate the process for promotion to the title of Assistant Professor until, at the earliest, July 2007, when the faculty practice website was being developed, (Defs.' 56.1 Statement ¶ 84.) Plaintiffs next communication with anyone at Columbia regarding her promotion was not until March 2008, (*id.* ¶ 85), when Dr. Lichtenthal decided it would be appropriate to consider Plaintiff for promotion. He became aware that Plaintiff still held the title of "instructor" during a review of the personnel records of the faculty practitioners at the Morningside practice. (Defs.' 56.1 Statement ¶¶ 86–87.) Dr. Lichtenthal reasoned that it was time to promote Plaintiff based on her long tenure, additional responsibility, and recent evaluations from the residents in charge. (Lichtenthal Tr. 52:19–53:6.)

On March 27, 2008, Steven Harris, Dr. Lichtenthal's administrative assistant, reached out to Plaintiff on behalf of Dr. Lichtenthal and asked that she submit the documentation required to be considered for promotion. (Defs.' 56.1 Statement ¶ 88–89; Huggins Aff. Ex. 17.)

Plaintiff submitted the requested documentation in early June 2008. (Defs.' 56.1 Statement ¶ 90.) Dr. Lichtenthal then forwarded it to Dr. Lamster along with his recommendation that Plaintiff be promoted to the rank of Assistant Professor. (*Id.*) As per protocol, Dr. Lamster then sent this information to Dr. Lee Goldman, along with the recommendation that Plaintiff be promoted to the rank of Assistant Professor of Clinical Dental Medicine (*Id.* ¶ 91.)

Plaintiff's promotion to the title of Assistant Professor of Clinical Dental Medicine was approved, effective July 1, 2008. (*Id.* ¶ 92.)

## VIII. Plaintiff's Interactions with Dr. Raquel Silvera

In August 2009 and January 2010, Plaintiff and Dr. Silvera—a dentist who also treated patients at the Morningside practice—had two run-ins.

In August 2009, Plaintiff emailed her supervisor, Dr. Joseph McManus, regarding an incident that had occurred between Plaintiff and Dr. Silvera. (Defs.' 56.1 Statement ¶ 101; Huggins Aff. Ex. 26.) On August 18, 2009, Plaintiff had entered the private office to retrieve a cup that she stored in a desk in the office that Plaintiff usually used, (Huggins Aff. Ex. 26 at COL000169.) At that time, Dr. Silvera was sitting at the desk using the computer, so Plaintiff asked her to move so she could get access to her cup. (*Id.*) Dr. Silvera did not respond to Plaintiff's first request, and continued using the computer. (*Id.*) After Plaintiff's second request, Dr. Silvera allowed Plaintiff to retrieve her cup from the desk. (*Id.*)

A short while later, Plaintiff returned to the office and again asked Dr. Silvera for access to the desk so Plaintiff could retrieve her lunch utensils; Dr. Silvera did not respond until Plaintiff's third request. (*Id.*) As Plaintiff was leaving the office, Dr. Silvera said to her, "You need to let me know what you need in this desk because I do not intend to keep moving." (*Id.* at COL000170.)

Plaintiff complained to Dr. McManus in her email that Dr. Silvera had spoken to her in an inappropriate tone and had acted in a disrespectful manner. (*Id.*) In response to Plaintiff's email, Dr. McManus encouraged Plaintiff and Dr. Silvera to resolve their conflict or to meet with the Dental School's "conciliator/mediator" for assistance in doing so. (Huggins Aff. Ex, 27.) After speaking with Dr. Silvera, Plaintiff decided to avoid the situation by staying out of the private office on the one day a week their schedules overlapped. (IDB Tr. 262:4–263:25, 264:11–22.)

In January 2010. Plaintiff emailed Drs. McManus and Lichtenthal regarding a second incident that had occurred between Plaintiff and Dr. Silvera. (Defs.' 56.1 Statement ¶ 106.) In this email, Plaintiff reported that, on January 5, 2010, Plaintiff was working at one of the two computers in the private office when Dr. Silvera came in and began shouting at Plaintiff to get up because Dr. Silvera needed to use the computer Plaintiff was using. (*Id.* ¶ 107; Huggins Aff. Ex. 28 at COL000172,) Plaintiff informed Dr. Silvera that Plaintiff did not find this form of harassment either acceptable or necessary. (*Id.*) Dr. Silvera responded that Plaintiff does "not know what harassment is, and if you think it is, then you should call the cops." (*Id.*) Dr. Silvera left and returned a few minutes later with the Office Manager. When Plaintiff attempted to explain what had happened, Dr. Silvera became upset and

said to Plaintiff, "you may be the Assistant Director but you are not my supervisor and I donot [sic] have to be cautious about what I say to you and how I say it." (*Id.*) When Plaintiff told Dr. Silvera that some staff members had heard Dr. Silvera shouting at Plaintiff, Dr. Silvera replied, "all the staff is lying and I would not shout at someone as old as you!" (Defs.' 56.1 Statement ¶ 107.)

In response to receiving this email from Plaintiff, Dr. Lichtenthal contacted Plaintiff and Dr. Silvera and "strongly suggest[ed]" that they meet with the conflict resolution officer, as this incident was not the first interpersonal conflict that had arisen between them. (Huggins Aff. Ex. 29; Defs.' 56.1 Statement ¶ 110; Lichtenthal Tr. 40:18–41:21;.)

Sometime thereafter, when it appeared that Plaintiff and Dr. Silvera were not going to be able to resolve their differences, Dr. Lichtenthal requested that Dr. Silvera be moved out of the Morningside practice to a different site, which Dr. Lamster approved. (Defs.' 56.1 Statement ¶ 111; Lichtenthal Tr. 42:10–43:12.)

It is undisputed that Dr. Silvera did not utter any race-based or gender-based discriminatory remarks at or toward Plaintiff before, during, or after these run-ins. (Defs.' 56.1 Statement ¶ 100.)

## IX. The Alleged Transfer Requests

Plaintiff alleges in her Opposition that Dr. Marshall "repeatedly requested that Plaintiff be transferred to another facility in 2008." (Opp'n at 13.) Although Plaintiff cited no evidentiary support for this statement Dr. Lichtenthal testified that Dr. Marshall did indeed ask him to reassign Plaintiff. (Lichtenthal Tr. 33:9–21.) This deposition excerpt comes from Defendants' exhibits, however, and does not contain the frill discussion of Dr. Marshall's request to transfer Plaintiff (the deposition transcript provided to the Court is cut off,

and does not contain a complete discussion on this topic). The relevant excerpt that the Court does have does not include the date on which Dr. Marshall made his request (or requests.) There is no evidence that Plaintiff was aware of this request until this litigation.

## X. Omission on Columbia University's Website

Plaintiff's 2008 promotion was not reflected on Defendant's website until two years after her promotion went into effect. (IDB Tr. 180:25–181:25.)

Plaintiff asserts that this omission cost her "countless patients." (Opp'n at 10.)

## XI. Plaintiffs Health

In 2010, Plaintiff was diagnosed by Dr. Frank Mosca with Post Traumatic Stress Disorder and other emotional distress, allegedly arising out of the April 18, 2007 Incident. (Comrie Affirm. Ex. G.) Plaintiff claims she suffers from Systematic Lupus Erythematosus, and her symptoms were exacerbated as a result of the distress she suffered at the hands of the Defendants. (IDB Tr. 202:15.) Ever since the April 18, 2007 incident with Dr. Marshall, Plaintiff suffers from hair loss, the inability to sleep, extreme tearfulness, emotional distress (e.g., anxiety, depression), increased blood pressure, the worsening of her Lupus, and an inability to relate to and function with her family. (*Id.* at 202:3–21.) She asserts that these events have affected her dental performance, (*Id.*)

## XII. Procedural History

On September 23, 2008, Plaintiff filed a charge with the EEOC alleging sex-based discrimination and retaliation. (Defs.' 56.1 Statement ¶ 2; Huggins Aff. Ex. 2 ("EEOC Complaint").) Plaintiffs EEOC Complaint contains no allegations of dis-

crimination on the basis of race. (Defs.' 56.1 Statement ¶ 2; *see also* EEOC Complaint) On the cover sheet to Plaintiffs EEOC Complaint, the box for "race" in the "Circumstances of Alleged Discrimination" is not checked, (EEOC Complaint at 1). Nowhere in the fifteen-page charge does Plaintiff allege that she is a member of a protected racial or ethnic class, (*see generally id.*).

On March 8, 2010, the EEOC issued a Dismissal and Notice of Rights, giving Plaintiff the right to sue, and determining that "[it was] unable to conclude that the information obtained establishes violations of the statutes." (Huggins Aff. Ex. 3.)

Plaintiff filed her lawsuit within 90 days of her receipt of the Notice of rights, on June 2, 2010. Plaintiff's complaint alleges that Defendants subjected her to a hostile work environment, discriminated against her by failing to promote her, and retaliated against her on the basis of her race and gender, in violation of Title VII, the NYSHRL, the NYCHRL, and § 1981.

## DISCUSSION

### I. Standard of Review

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. U.S. Veterans Admin.*, 870 F.2d 57, 60 (2d Cir.1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the motion for summary judgment is properly made, the burden shifts to the non-moving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. The nonmovant "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998), but must support the existence of an alleged dispute with specific citation to the record materials, Fed.R.Civ.P. 56(c).

While the Court must view the record "in the light most favorable to the non-moving party," *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1559 (2d Cir.1989) (citations omitted), and "resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought," *Heyman v. Commerce and Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975) (citations omitted), the non-moving party nevertheless "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*, 475 U.S. at 586, 106 S.Ct. 1348 (citations omitted). Not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from cir-

cumstantial evidence found in affidavits and depositions. Nonetheless, summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir.2001) (internal quotations omitted); *see also Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

## II. Plaintiff's Title VII Claims Related to Her Race Are Precluded Because She Failed to Exhaust Her Administrative Remedies

■ Exhaustion of administrative remedies through the EEOC is "an essential element" of the Title VII statutory scheme and, as such, a precondition to bringing such claims in federal court. *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir.2001). Accordingly, before an individual may bring a Title VII suit in federal court, the claims forming the basis of such a suit must first be presented in a complaint to the EEOC or the equivalent state agency. *Williams v. N.Y. City Hous. Auth.*, 458 F.3d 67, 69 (2d Cir.2006) (per curium) (citing 42 U.S.C. § 2000e–5 (2000)). The claimant must submit the EEOC filing within 300 days of the alleged discriminatory conduct and, before bringing suit, must receive a "Notice of Right to Sue" letter from the EEOC. *Legnani*, 274 F.3d at 686.

■ In addition to the claims included in the EEOC letter, a plaintiff may also raise in a federal complaint claims that are "reasonably related" to the allegations made in the plaintiff's EEOC charge. *Williams*, 458 F.3d at 70. In this inquiry, "the focus should be 'on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving.'" *Id.*

(quoting *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir.2003)). "The central question is whether the complaint filed with the EEOC gave that agency 'adequate notice to investigate discrimination on both bases.'" *Id.* (quoting *Deravin*, 335 F.3d at 202).

■ "Normally, courts deem a Title VII claim to be outside the scope of the investigation that could reasonably be expected to grow out of the EEOC charge when the basis for discrimination alleged in the charge is a different basis than that alleged in the complaint (e.g., racial, rather than gender, discrimination)." *Castagna v. Luceno*, No. 09–CV–9332 (CS), 2011 WL 1584593, at *9 (S.D.N.Y. Apr. 26, 2011) (affirming dismissal of religious discrimination claim where EEOC complaint only alleged race and gender discrimination and did not "include any incidents that would have allowed ... [an] investigat[ion into] such allegations"); *see also Carter v. New Venture Gear, Inc.*, 310 Fed.Appx. 454, 458 (2d Cir.2009) (affirming dismissal of gender discrimination claim where EEOC complaint only alleged race discrimination); *Wali v. One Source Co.*, 678 F.Supp.2d 170, 183–84 (S.D.N.Y.2009) (dismissing religious discrimination claim where EEOC complaint alleged racial discrimination; mere fact that plaintiff's "name may appear to be a Muslim name" was not enough to put the EEOC on notice of such claims); *see also Ford v. N.Y.C. Dep't of Health & Mental Hygiene*, 545 F.Supp.2d 377, 391 (S.D.N.Y.2008) (dismissing race discrimination claim that bore "no factual relation to [the] allegations" in her EEOC complaint, which only alleged that plaintiff was unlawfully discharged and discriminated against because of her sex, religion, and perceived disability), *aff'd*, 352 Fed.Appx. 471 (2d Cir.2009).

■ Plaintiff alleged nothing about race discrimination in her EEOC Complaint,

and cited no facts that would have allowed the EEOC to investigate such discrimination. *See Marshall v. N.Y.C. Bd. of Elections,* 322 Fed.Appx. 17, 18 (2d Cir.2009). Both the "race" and "color" boxes under the "Circumstances of Alleged Discrimination" section of the cover sheet to her EEOC charge remain unchecked; only the boxes for "sex" and "retaliation" were checked. (EEOC Complaint at 1.) Of note, when discussing her 2006 interactions with Ms. Cascardo in her EEOC allegations, Plaintiff failed to mention—as she later alleged in her deposition, but not Complaint (IDB Tr. 199:23–24)—that Ms. Cascardo told Plaintiff that "the University and herself did not like blacks." (*See id.* at 10.) This Court could not find a single instance in the fifteen-page charge where Plaintiff alleges that she is a member of a protected class because of her race, or that she was in any way subject to discrimination on the basis of her race.[2]

Therefore, Plaintiff's Title VII claims related to her race are dismissed for failure to exhausted administrative remedies.

## III. Plaintiff has Failed to Establish a Prima Facie Case of Employment Discrimination on Either a Hostile Work Environment or Failure to Promote Theory

### A. The Legal Standards for Employment Discrimination

#### 1. Employment Discrimination in General

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or nation-al origin." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting 42 U.S.C. § 2000e–2(a)(1)). The Supreme Court has interpreted Title VII to encompass more than economic or tangible discrimination; it also forbids an employer to "require[e] people to work in a discriminatorily hostile or abusive environment." *Id.*

■ "Claims of employment discrimination under Title VII are analyzed pursuant to the tripartite burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)." *Lee v. Sony BMG Music Entm't, Inc.,* No. 07 Civ. 6733(CM), 2010 WL 743948, at *6 (S.D.N.Y. Mar. 3, 2010) (McMahon, J.). Discrimination claims under both the NYSHRL and the NYCHRL are also subject to the burden-shifting analysis applied to discrimination claims under Title VII. *Spiegel v. Schulmann,* 604 F.3d 72, 80 (2d Cir.2010).

Under that framework, a plaintiff initially bears the burden of producing evidence to support a prima facie case of discrimination by showing that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for her position, or was performing her job duties satisfactorily; (3) the plaintiff suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *see also Spiegel,* 604 F.3d at 80. While "Such evidence need be no more than 'minimal' or

---

**2.** It is totally unclear to this Court why Plaintiff claims, without a citation, that "the EEOC Charge identifies Plaintiff as an African–American female...." (Opp'n at 8,) This is either a massive oversight, or a flat out misrepresentation. Plaintiff's counsel is cautioned that neither is appropriate in this Court.

'de minimis,' " *Campbell v. Cellco P'ship,* 860 F.Supp.2d 284, 295, No. 10 Civ. 9168(SAS), 2012 WL 400959, at *6 (S.D.N.Y. Feb. 7, 2012), a plaintiffs claims nevertheless fail if she cannot make out her prima facie case, *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir.2004).

■ On summary judgment, the district court's "determination of whether the circumstances 'giv[e] rise to an inference' of discrimination must be a determination of whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *Bryant v. Verizon Commc'ns, Inc.,* 550 F.Supp.2d 513, 535 (S.D.N.Y.2008). The district court is not itself to decide what inferences should be drawn. *Id.*

"Once a plaintiff establishes a prima facie Title VII case, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the employment decision at issue." *Carter,* 310 Fed.Appx. at 456. "If the employer satisfies this requirement, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer was acting with pretext." *Id.*

### 2. The Legal Standard for a Hostile Work Environment Claim Under Title VII and the NYSHRL

Being forced to endure a hostile work environment qualifies as an adverse employment action. *See Lee,* 2010 WL 743948, at *6.

■ To survive a summary judgment motion on a hostile work environment claim under Title VII and the NYSHRL, Plaintiff must introduce evidence showing that her "workplace was permeated with discriminatory intimidation, ridicule, and insult," which was "sufficiently *severe or pervasive* to alter the conditions of the victim's employment and create an abusive work environment." *Harris,* 510 U.S. at 21, 114 S.Ct. 367 (quotation marks and citations omitted) (emphasis added); *Forrest v. Jewish Guild for the Blind,* 3 N.Y.3d 295, 310, 786 N.Y.S.2d 382, 819 N.E.2d 998 (N.Y.2004) (applying the *Harris* standard to claims arising under the NYSHRL).

■ Courts must look to the totality of the circumstances *to* determine whether an environment is "hostile" or "abusive," and should consider the following nonexclusive list of factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. 367. "Although one encounter may constitute a hostile work environment, conduct that can be categorized as a few isolated incidents, teasing, casual comments or sporadic conversation will not be deemed to create a hostile work environment." *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 511 (S.D.N.Y.2003) (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2d Cir.1998); *Snell v. Suffolk Cnty.,* 782 F.2d 1094, 1103 (2d Cir.1986)).

■ Plaintiff's evidence must show that the conduct at issue created an environment that is both objectively and subjectively hostile. *See Richardson v. N.Y. State Dep't of Corr. Serv.,* 180 F.3d 426, 436 (2d Cir.1999); *Forrest,* 3 N.Y.3d at 311, 786 N.Y.S.2d 382, 819 N.E.2d 998.

■ However, as put by Justice Scalia, Title VII is not a "general civility code" for the workplace. *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). "A hostile work environment claim is ac-

tionable only as a form of prohibited discrimination, with the hostile work environment being the adverse employment action to which the plaintiff is subjected on account of race, gender, religion or national origin." *Lee*, 2010 WL 743948, at *7. Regardless of whether Plaintiff can prove that she was exposed to a work environment that was both objectively and subjectively hostile, Plaintiff can only succeed on her claim if she can prove that her "mistreatment at work . . . through subjection to a hostile environment . . . occur[red] *because of* a[ ] . . . protected characteristic." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir.2001) (emphasis added).

### 3. The Legal Standard for a Hostile Work Environment Claim Under the NYCHRL

While courts had previously interpreted the NYCHRL as being coextensive with Title VII and the NYSHRL, the New York City Council rejected such equivalence by passing the Local Civil Rights Restoration Act of 2005 ("Restoration Act"). *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 277–79 (2d Cir.2009) (explaining that the Restoration Act "abolish[ed] 'parallelism' between the [NYCHRL] and federal and state anti-discrimination law"). Accordingly, this Court must evaluate Plaintiff's NYCHRL hostile work environment claim separately from her Title VII and NYSHRL claims.

 Because the NYCHRL was designed to be "broader and more remedial" than Title VII and the NYSHRL, a plaintiff bringing a hostile work environment claim need not meet the Supreme Court's "severe or pervasive" threshold to be actionable. *Williams v. New York City Housing Authority*, 61 A.D.3d 62, 872 N.Y.S.2d 27, 38 (2009). Instead, in determining whether a claim of hostile work environment survives summary judgment, the relevant consideration is whether there

is a triable issue of fact as to whether the plaintiff "has been treated less well than other employees because of her gender." *Id.* at 39; *see also Campbell*, 860 F.Supp.2d at 298, 2012 WL 400959, at *8.

 With that said, the NYCHRL, like Title VII and the NYSHRL, is still not a " 'general civility code,' " and "petty slights and trivial inconveniences" are not actionable. *Campbell*, 860 F.Supp.2d at 298, 2012 WL 400959, at *8 (quoting *Williams*, 872 N.Y.S.2d at 38, 40).

### B. Plaintiff's Hostile Work Environment Claims Fail

Defendants do not contest that plaintiff has established the first two elements of Plaintiff prima facie case: (1) Plaintiff is a member of two protected classes (as an African American female); and (2) she was qualified for her position. Defendants also do not dispute that Plaintiff seems to feel that her work environment was hostile. Rather, Defendants argue that Plaintiff has failed to adduce any evidence that Plaintiff was subjected to: (1) an objectively hostile work environment; or (2) if she was, it was *because of* either her race or her gender. For the reasons that follow, I agree with Defendants.

### 1. Plaintiff Fails to Raise a Genuine Issue of Fact That She Suffered an Objectively Hostile Work Environment Under Either Title VII or the NYSHRL

 The small number of events that Plaintiff offers to support an objectively hostile work environment are neither severe, pervasive, nor a combination of both. Instead, they represent isolated events that occurred over a substantial period of years. These sporadic events did not materially alter Plaintiffs day-to-day working conditions, and most of Plaintiffs complaints were addressed and resolved by the parties prior to this lawsuit.

Plaintiff's contention that she was subjected to a hostile work environment is based on the following incidents, spread out over almost four years:

(i) being cursed at, and further imprisoned by her supervisor on April 18,2007;

(ii) being yelled at and having paper thrown at her on June 6, 2007;

(iii) having her complaints to Defendants ignored or responded to insufficiently and without haste in 2007;

(iv) being falsely accused of vacation policy violations and having her vacation records fabricated by her supervisor in 2008;

(v) being accused of fraud, theft and embezzlement in 2006;

(vi) having repeated requests for her transfer and reassignment by her supervisor in 2008;

(vii) being overlooked for a promotion until July 2008;

(viii) being harassed, verbally abused and humiliated to illness (high blood pressure and dizziness sufficient to cancel her remaining patients) by her coworker Dr. Raquel Silvera in 2009 and 2010, and being constructively evicted from the Morningside Dental Practice on the days in which Dr. Silvera worked; and

(ix) having her promotion in 2008 not reflected on the company's website until 2010 costing her countless patients.

(Opp'n at 10.)

 Under Title VII and the NYSHRL, "The standard for a hostile work environment claim is 'demanding,' and the plaintiff must prove that the conduct was 'offensive, pervasive, and continuous enough to amount to a constructive discharge.'" *De La Rosa v. City of N.Y. Police Dept.*, No. 09 Civ. 5290(SAS), 2010 WL 4177626, at *8 (S.D.N.Y. Oct. 22, 2010) (quoting *Scott v. Memorial Sloan–Kettering Cancer Ctr.*, 190 F.Supp.2d 590, 599 (S.D.N.Y.2002)). Relevant factors include:

"the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. 367. In establishing this element, a plaintiff needs to show only that her hostile working environment was "sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Pucino v. Verizon Wireless Commc'ns, Inc.,* 618 F.3d 112, 119 (2d Cir.2010) (emphasis in original); *see also Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999) ("A plaintiff must still prove that the incidents were 'sufficiently continuous and concerted' to be considered pervasive, or that a single episode is 'severe enough' to establish a hostile working environment.") (internal citation omitted).

#### a. No Single Incident is "Severe" by Itself as a Matter of Law

 In limited circumstances, a single, severe, episode of harassment can create a hostile work environment. *See Mathirampuzha v. Potter,* 548 F.3d 70, 78–79 (2d Cir.2008). For example, a "single incident of rape," would sufficiently alter "the conditions of the victim's employment and ... create an abusive work environment for purposes of Title VII liability.'" *Id.* at 79 (quoting *Ferris v. Delta Air Lines, Inc.,* 277 F.3d 128, 136 (2d Cir.2001)). At a minimum, though, the single incident must create an "intolerable alteration" of the plaintiff's "working conditions, so as to substantially interfere with or impair his ability to do his job," *Id.* (internal citations omitted).

In *Mathirampuzha,* the Second Circuit affirmed a summary judgment order dismissing a claim of national origin discrimi-

nation. The plaintiff in that case, the plaintiff's supervisor "grabbed the plaintiff's arm, punched him in the shoulder and the chest, spit in his face, and poked him in the eye." *Id.* at 73. As a result of the incident, the plaintiff "suffered chest pains and contusions to his shoulder blade, required eye surgery, and fell into a depression." *Id.* Even with such physical harm, the court held that the plaintiff failed to establish a prima facie case of discrimination, because that one incident did not amount to an adverse employment action. *Id.* at 78. The Second Circuit explained its rationale as follows:

> The physical encounter itself, while understandably upsetting, was not so severe as to alter materially the plaintiffs working conditions—unlike, for example, a rape, or an obscene and humiliating verbal tirade, that undermines the victim's authority in the workplace ... Although a more severe incident of harassment or abuse could constitute an adverse employment action, the brief incident in this case, however regrettable, does not meet the "extraordinarily severe" standard.

*Id.* at 79 (internal citations omitted).

If the incident in *Mathirampuzha* was not severe enough to alter materially the plaintiffs working conditions, then no rational jury could find that any of the incidents between this Plaintiff and Dr. Marshall or Dr. Silvera meets the "extraordinarily severe" standard. Even if everything Plaintiff alleges is true, Plaintiff has suffered nowhere near as much harm inflicted on the plaintiff in *Mathirampuzha*. Plaintiff had issues with Dr. Marshall and Dr. Silvera. She brought her issues to the attention of Columbia University officials. Counseling and discipline ensued. Plaintiffs complaints, far from being ignored, were addressed by the University, and resolved.

Cascardo's 2006 statement—the only comment regarding Plaintiff's race over the course of her employment—is also not enough to establish a hostile work environment by itself. For "racist comments, slurs, and jokes" to be actionable as a hostile work environment, there generally "must be more than a few isolated incidents of racial enmity ...." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (internal citation and quotation marks omitted). "Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Id.* (citation omitted); *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 713 (2d Cir.1998) (no hostile work environment where supervisor made, on occasion, racist remarks, including one directed at the plaintiff).

In sum, no reasonable juror could find that any of the incidents Plaintiff describes were sufficiently severe to materially after Plaintiff's working conditions.

**b. No Rationale Juror Could Find Nine Incidents of Incivility Over a Four Year Period Constituted Pervasive Harassment**

To be considered pervasive, "The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief." *Kotcher v. Rosa and Sullivan Appliance Center, Inc.*, 957 F.2d 59, 62 (2d Cir.1992); *see also Carrero v. N.Y.C. Housing Auth.*, 890 F.2d 569, 577 (2d Cir.1989) ("The incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.").

Here, the nine incidents that Plaintiff claims created her hostile work environment are episodic and isolated, spread out over four years. They are not continuous enough to be considered "pervasive" by a rational juror.

While Cascardo suggested that Plaintiff had embezzled funds in 2006, the sugges-

tion was withdrawn when the evidence failed to support it. Dr. Marshall apologized for Cascardo's suggestion and informed Cascardo about the need to be respectful in her communications with Plaintiff and others. (Marshall Tr. 82:3–12; IDB Tr. 191:19–25; Huggins Aff. Ex. 25.) Cascardo herself told Plaintiff she was not being accused of anything.

Plaintiffs run-ins with Dr. Marshall occurred almost one year later. Her clashes with Dr. Marshall arose out of completely different facts—the general condition of the Morningside Dental practice and Plaintiff's vacation days—and her complaint about his behavior was investigated and resolved. Plaintiff herself admits that she had "no further interactions with Dr. Marshall after June 6, 2007 [the second incident] that she found to be objectionable in any way." (Defs.' 56.1 Statement ¶ 81 (citing IDB Tr. 157:15–20).) *See Mathirampuzha*, 548 F.3d at 79 (finding no adverse action where, in part, the employer's response to alleged adverse action "ultimately ameliorated the plaintiff's working conditions").

Which brings us to Plaintiff's interactions with Dr. Silvera. These occurred over two years after her clashes with Dr. Marshall. Again, nothing connects these two incidents in August 2009 and January 2010 with anything that came before. Further, when it appeared that Dr. Silvera and Plaintiff would not be able to resolve their differences, Dr. Silvera was moved out of the Morningside practice to a different site, thereby solving the problem for Plaintiff. (Lichtenthal Tr. 42:10–43:12; Lamster Tr. 28:21–29:17.) *See Mathirampuzha*, 548 F.3d at 79.

The other incidents Plaintiff points the Court to are too minor and sporadic, even if one assumes they occurred as alleged by Plaintiff, to rise to the level of "pervasive," even in combination.

Of course, a plaintiff "need not recount each and every instance of abuse to show pervasiveness." *See Pucino*, 618 F.3d at 119–120. A plaintiffs general allegations of constant abuse, confirmed by third parties, could reasonably constitute pervasive harassment, "even in the absence of specific details about each incident." *Id.* at 120 (citing *Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir.1997)). But Plaintiff has offered no confirmatory evidence, and so has not met her burden using this alternative method.

In sum, the events Plaintiff describes are neither severe, pervasive, nor some sufficient combination thereof to raise a genuine issue of material fact. Therefore, Plaintiff has failed to establish that she suffered from a hostile work environment under Title VII and the NYSHRL.

**2. Plaintiff's Hostile Work Environment Claims Fail Because There is no Genuine Issue of Material Fact That any Harassing Conduct was Based on Plaintiff's Race or Gender**

Plaintiff's evidence might conceivably raise a fact issue with respect to whether she suffered an objectively hostile work environment under the NYCHRL's more liberal "different treatment" standard: "Under the [NYCHRL], liability should be determined by the existence of unequal treatment and questions of severity and frequency reserved for consideration of damages." *Campbell*, 860 F.Supp.2d at 298, 2012 WL 400959, at *8 (quoting *Selmanovic v. NYSE Grp., Inc.*, No. 06 Civ. 3046, 2007 WL 4563431, at *4 (S.D.N.Y. Dec. 21, 2007)).[3] Nevertheless,

---

**3.** Were there reason to take this claim to trial I would decline to exercise supplemental jurisdiction, since 1 strongly believe that NYCHRL hostile work environment claims— which are subject to different standards from Title VII claims—should be adjudicated in the state court.

I grant Defendants' motion for summary judgment on her hostile work environment claim under the NYCHRL as well, because Plaintiff has failed to raise a fact issue on the fourth element of her prima facie case—that any mistreatment she suffered was motivated by Defendants' discriminatory animus. *Hill v. Rayboy–Brauestein,* 467 F.Supp.2d 336, 359 (S.D.N.Y.2006) ("Plaintiff must prove that the hostile conduct occurred because of her membership in a protected class."); *Williams,* 872 N.Y.S.2d at 39 (to establish a prima facie case for employment discrimination under the NYCHRL, "the relevant consideration is whether there is a triable issue of fact as to whether the plaintiff 'has been treated less well than other employees *because of* her [protected characteristics].'"); *Campbell,* 860 F.Supp.2d at 298, 301, 2012 WL 400959, at *8, *11 (citing *Williams,* 872 N.Y.S.2d at 39).[4]

Plaintiff never asserts that anyone ever made derogatory comments to her that ridiculed or insulted her because of her gender; Plaintiff could not point to a single instance where anyone said anything related to Plaintiffs sex. Plaintiff also fails to offer any evidence from which a reasonable jury could infer that any of the incidents in this case occurred because of Plaintiff's gender.

Plaintiff argues that the following evidence would permit a rational finder of fact to conclude that she was subjected to a hostile work environment *because of* her race and gender

(1) Cascardo told Plaintiff that "the University and herself did not like blacks," (Opp'n at 4; IDB Tr. 199:23–24);

(2) Marshall also yelled at Linda Long, a female African–American dental assistant, on April 18, 2007, (Long Aff. at ¶ 2, 4–5);

(3) Plaintiff is the "only African–American female dentist at Defendants' Morningside Dental Facility, (Opp'n at 10; IDB Tr. 288:16);

(4) Dr. Marshall never asked other professionals to clean the carpets, (IDB Tr. 60:6–7); and

(5) Plaintiff did not witness Dr. Silvera verbally abuse any coworker except Plaintiff, the only African–American female dentist employed at the Morningside practice, (*id.* at 272:8–11).

Because nothing in the record connects any of these incidents with her gender, Plaintiff fails to raise a genuine issue of material fact as to her hostile work environment claims based on her gender, under the NYCHRL or any statute.

Plaintiff's primary evidence that Defendants subjected her to a hostile work environment because of her race is Cascardo's August 2006 statement that "the University and herself did not like blacks." (IDB Tr. 199:23–24.)

The Court first notes that nonparty Cascardo's statement is inadmissible at trial for the truth of the matter asserted—i.e., that Columbia (which is a defendant) dislikes African–Americans. *See Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 131 n. 12 (2d Cir.2004) (stating that a district court is free to disregard the portions of affidavits that contain hearsay that would be inadmissible at trial); *see also Spadaro v. McKeon,* 693 F.Supp.2d 183 (N.D.N.Y.2010) (comments allegedly made by employees, recounted in employer's deposition, constituted inadmissible hearsay, "and" were not admissible on motion for summary judgment on disparate treatment claim under Title VII); *Woods v. Enlarged City Sch. Dist. of Newburgh,* 473 F.Supp.2d 498, 521 (S.D.N.Y.2007). While evidence produced by the party op-

**4.** Plaintiff's Title VII and NYSHRL claims also fail on this ground.

posing a summary judgment motion need not be "in a form that would be admissible at trial," *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548, "its content must nonetheless be admissible," *Smith v. Stone & Webster Eng'g Corp.,* No. 86 CIV. 5627(PKL), 1988 WL 32928, at *4 (S.D.N.Y. Apr. 4, 1988). "If a deponent states that he overheard another person make a statement, and the deponent would not be allowed to testify at trial as to what the other person said because of the rule against hearsay, the deponent's statement may not be considered on a motion for summary judgment." *Donovan v. Diplomat Envelope Corp.,* 587 F.Supp. 1417, 1426 (E.D.N.Y.1984), aff'd, 760 F.2d 253 (2d Cir.1985).

In *Smith v. Stone & Webster Engineering Corp.,* the plaintiff—a black engineer—sued his employer—an engineering firm—under Title VII, alleging that his employer discriminated against him by assigning him to "a porter's duty to remove . . . files and dump same, by carting them in a heavy dumpster," 1988 WL 32928, at *1. The plaintiff asserted that "nonminority engineers never were assigned to clean out files when they were between projects." *Id.* at *4. The only evidence that the plaintiff offered about discriminatory motive was his deposition testimony regarding statements made by other engineers. *Id.* In his deposition, the plaintiff testified that other engineers employed by defendant told him that the plaintiff received the unfavorable assignment because he is black. *Id.* The court refused to consider the statements because they were hearsay, noting that, even if they were admissible, the plaintiffs fellow employees "were in no position to possess first hand knowledge of [the plaintiffs supervisor's] state of mind when he gave [the plaintiff] the assignment." *Id.*

 The facts here are similar to, and even less probative of a defendant's state of mind than, those in *Smith.* Cascardo is not a defendant in this action, and so her statement cannot be admitted as a party admission under Federal Rule of Evidence 801(d)(2). Additionally, there is no evidence that Cascardo possessed or was in a position to possess any knowledge of Columbia University's state of mind when she allegedly made the statement, or that she was authorized to speak for Columbia University. According to the record, she was an outside consultant—not even an employee of Columbia University—let alone one situated in a sufficiently senior position to give her the authority to bind Columbia by her statements. Therefore, as in *Smith,* it would not be appropriate for the Court to consider the hearsay testimony offered by Plaintiff here to establish that discriminatory animus motivated whatever adverse treatment to which she was subjected.

Furthermore, even if the Court were to consider it, this single statement is insufficient to establish that Plaintiff was subject to a hostile work environment because of her race. *See, e.g., Woods,* 473 F.Supp.2d at 520–21 (finding that the plaintiff was not "intimidated, ridiculed or insulted because of her race," where, "Of the approximately two hundred specific incidents of alleged harassment, only one has racial overtones whatsoever."); *Hill,* 467 F.Supp.2d at 360 (finding that the use of a racial epithet by a supervisor alone was insufficient to establish that any hostile work environment was the result of racial discrimination).

In *Hill,* the plaintiff—an African–American woman—sued her employer under Title VII and the NYSHRL for, among other things, subjecting her to a hostile work environment. 467 F.Supp.2d 336. The plaintiff's evidence in support of her claim was a long list of racially-neutral incidents—such as "excessive review and scrutiny," and "requests for documentation before granting vacation," *id.* at 351—as well

as the fact that two defendants on separate occasions called her a "nigger," *id.* at 359–60. The plaintiff "produced no evidence that any similarly situated non-African-American employees were treated differently, other than her own conclusory allegations." *Id.* at 360.

In dismissing the plaintiffs claims on summary judgment, Judge Karas recognized that facially race-neutral events can constitute a hostile work environment, and that a plaintiff bringing such a claim can rely on a supervisor's use of a racial epithet in combination with other evidence of discriminatory motivation. *Id.* at 360–61. However, the plaintiff in that case failed to provide any evidence beyond the one-off comment that the otherwise race- and gender-neutral instances of workplace abuse in that case were motivated by discriminatory animus, and Judge Karas granted the defendants' motion for summary judgment. *Id.*

Here, like the plaintiff in *Hill,* Plaintiff offers a few discrete, facially neutral events, plus *one* statement from 2006, by an outside consultant to Columbia, regarding an alleged attitude about Plaintiff's race. This single statement does not afford a sufficient basis for a jury to conclude that the other discrete incidents occurred out of discriminatory animus.

The remainder of Plaintiff s position can be boiled down to the following conclusory statement from her opposition papers: "[Plaintiff's] disparate treatment can only be motivated by retaliatory animus, since no other non-African American and/or male [sic] dentist suffered similar abuse." (Opp'n at 15.) This subjective—and unsupported—belief is insufficient to raise a genuine issue of material fact. *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 456 (2d Cir.1999) ("Plaintiff's "feelings and perceptions of being discriminated against are not evidence of discrimination"."） (internal quotations omitted); *see also Hill,* 467 F.Supp.2d at 360 ("When a person only makes general allegations that African-Americans are treated differently in the workplace, those allegations are insufficient to support a hostile Work environment claim."); *Cameron v. Cmty. Aid for Retarded Children, Inc.,* 335 F.3d 60, 63 (2d Cir.2003) ("Purely conclusory allegations of discrimination, absent any concrete particulars, are insufficient" to defeat a motion for summary judgment.) (internal quotations omitted). Plaintiff does not offer the sort of evidence required to survive summary judgment—evidence that similarly-situated white or male employees were treated more favorably than she was, or that her treatment was based on her race or gender. *See Hill,* 467 F.Supp.2d at 360.

Plaintiff's "general allegations" also resemble those at issue in *Sharpe v. MCI Communications Services, Inc.,* 684 F.Supp.2d 394 (S.D.N.Y.2010). In *Sharpe,* a plaintiff sued his employer under Title VII, alleging a hostile work environment based on race. The court dismissed the claim, finding that the plaintiff failed to provide "concrete particulars" to prove a racially hostile work environment. *Id.* at 400. The court found insufficient the plaintiffs allegations that: (1) the plaintiff's supervisor treated the plaintiff harshly, (2) the supervisor was "nasty" and "mean" when it came to people of color, and (3) the supervisor did not yell at his white employees. *Id.* at 400–01. Additionally, the court also found it relevant that the plaintiff admitted that his supervisor never made any racially derogatory comment, and none of the plaintiffs complaints mentioned race discrimination. *Id.* at 401.

Like the plaintiff in *Sharpe,* Plaintiff here has offered only conclusory assertions from her deposition that similarly situated white employees were treated more favorably than she was, or that her treatment was based on any improper basis, and thus

failed to produce evidence from which a jury could infer discriminatory animus. Further, Plaintiff offered no evidence that either Dr. Marshall or Dr. Silvera ever said anything related to Plaintiff's race or gender at any time during their interactions—evidence that might have raised an inference that their harsh treatment of Plaintiff was related to her race or gender. *See Boise v. N.Y. Univ.*, No. 03 Civ. 5862(RWS), 2005 WL 2899853, at \*4 (S.D.N.Y. Nov. 3, 2005) (a plaintiff's personal speculation as to the underlying purposes of events is "insufficient as a matter of law to raise an inference of discrimination."). The fact that Plaintiff did not witness Dr. Marshall or Dr. Silvera speaking to anyone else in a similar manner also "proves nothing." *See Sharpe*, 684 F.Supp.2d at 400–01 (dismissing hostile work environment claim on summary judgment, and finding in part that "The fact that [African–American plaintiff's supervisor] did not yell at four white employees ... proves nothing."). Plaintiff admits that she was not present for every conversation Dr. Marshall had when he visited the office on April 18 and June 6, 2007, (IDB Tr. 60:15–61:2, 93:3–21), and the record actually establishes that Dr. Marshall asked Dr. Saini—a non-African-American male—about the overflowing garbage on April 18, 2007, (Marshall Tr. 30:24–31:14; Marshall Decl. Ex. B). *See also Campbell*, 860 F.Supp.2d at 300–01, 2012 WL 400959, at \*10 (the fact that a supervisor yelled at the African–American plaintiff but not other non-African-American employees over the same incident did not support an inference that the shouting was racially motivated).

The incident where Dr. Marshall yelled at Long—also an African–American female—on April 18, 2007 also does not suffice as evidence that Dr. Marshall harbored discriminatory animus towards African–American women. The record is clear that Dr. Marshall yelled at Long to return to where Long was supposed to be

on that day: the 116th Street facility. (Comrie Affirm. Ex. I ¶¶ 2–5). While certainly not a polite way to treat subordinates, it is impossible to draw any inference of discriminatory intent from the fact that Dr. Marshall yelled at an African–American woman, who was not where she was supposed to be. "The mere fact that the two employees involved in an incident were of different races does not give rise to an inference of racism, and that is all plaintiff has." *Lee*, 2010 WL 743948, at \*12; *see also Sharpe*, 684 F.Supp.2d at 400–01.

\* \* \*

In sum, Plaintiff has failed to raise a genuine issue of fact as to whether she was discriminated against *because of her race and/or gender*, and so has failed to establish a required element of her prima facie case of discrimination under the NYCHRL (and Title VII and the NYSHRL as well). To be sure, the record reveals a discrete number of regrettable conflicts between Plaintiff and her employers and co-workers. But Plaintiff's personal speculation about the underlying purposes of these incivilities is "insufficient as a matter of law to raise an inference of discrimination." *Boise*, 2005 WL 2899853, at \*4. "Mere personality conflicts must not be mistaken for unlawful discrimination, lest the antidiscrimination laws become a general civility code," even under the NYCHRL's more lenient standard. *Forrest*, 3 N.Y.3d at 309, 786 N.Y.S.2d 382, 819 N.E.2d 998 (collecting cases) (internal quotations omitted).

Accordingly, Defendants' motion for summary judgment on Plaintiff's hostile work environment claims is GRANTED.

### C. Plaintiff has Failed to Establish a Prima Facie Case of Failure to Promote

Along with her hostile work environment theory, Plaintiff also asserts that De-

fendants' failure to promote her until 2008 constitutes an adverse employment action. But Plaintiff has failed to produce evidence that would allow a reasonable jury to find in her favor.

■ In order to establish a prima facie case of a discriminatory failure to promote, a Title VII plaintiff ordinarily must demonstrate that: "(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Estate of Hamilton v. City of New York,* 627 F.3d 50, 55 (2d Cir.2010) (quoting *Petrosino v. Bell Atl.,* 385 F.3d 210, 226 (2d Cir.2004)) (quotation marks omitted).

While this test applies to both Plaintiff's Title VII and NYSHRL claims, courts in this circuit have yet to adopt a test for analyzing failure to promote claims under the broader and more liberal NYCHRL, *Campbell,* 860 F.Supp.2d at 297–98, 2012 WL 400959, at *8. Like my colleague, Judge Scheindlin, I will use the Title VII and NYSHRL standard as a guide, while keeping the NYCHRL's more liberal standards in mind. *See id.*

■ To make out a prima facie case of failure to promote, Plaintiff was required "to allege that she . . . applied for a specific position . . . and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion," *Brown v. Coach Stores, Inc.,* 163 F.3d 706, 710 (2d Cir.1998). Plaintiff has failed to establish a prima facie case for failure to promote because she has not adduced any evidence that she applied for a promotion prior to March 2008.

In *Brown,* the Second Circuit held that an individual alleging a failure to promote must establish that he or she applied for a

position because, "if generally requesting a promotion in an annual review were sufficient to establish a prima facie case, employers would be unfairly burdened in their promotion efforts." *Id.* Under such a regime, "an employer would additionally have to keep track of all employees who have generally expressed an interest in promotion and consider each of them for any opening for which they are qualified but did not specifically apply." *Id.*

■ Instead of offering any evidence that she applied for a position—or even asserting that she generally requested promotion—Plaintiff only proffered conclusory statements: (1) "The record is absent of any indication that Plaintiff *would not have qualified* for a promotion in 2002 through 2008"; and (2) "no other non-African American and/or male dentists at the Morningside had an incorrect and lesser title. . . ." (Opp'n at 15.) This does not establish a failure to promote. Plaintiff has offered evidence neither that she asked to be considered for promotion but was not, nor that Columbia had a schedule for promotion (after "x" number of years, all employees are continually considered for promotion) from which she was excluded. She also offered no evidence that her supervisors asked non-African-Americans or males to provide for promotion while not making the same suggestion to her. Any such evidence would buttress her claim. In the absence of any such evidence, the mere fact that she was not promoted until 2008 raises no genuine issue of fact.

Obviously, Plaintiff offered no evidence that she was *rejected* for a promotion. Because Plaintiff "never applied [for the position,] . . . [Plaintiff] was never rejected under circumstances that would give rise to an inference of racial discrimination," *Campbell,* 860 F.Supp.2d at 300, 2012 WL 400959, at *9.

Plaintiff has also failed to establish a prima facie case for failure to promote under the "more liberal standards" of the NYCHRL. *Id.* at 297, at *8. The same lack of relevant evidence dooms her New York City law claim. The fact is that Plaintiff never applied for a promotion prior to March 2008, and that, once she applied, she received it.

The outcome could have been different if there was evidence that Defendants had a policy of automatically promoting employees in Plaintiff's position who had two years of employment under their belts. And Plaintiff so contends. (IDB Tr. 159:1–2.) But her claim that promotion is automatic at Plaintiff's level, "directed by the department chair," finds no support in the record. To the contrary, the evidence shows that the promotion process at Columbia Dental School is not automatic, but is in fact applicant-driven, i.e., the applicant must apply for a promotion.

Moreover, even if the Court were to accept Plaintiff's assertion that she should have been automatically promoted after gaining two years experience in her role, that claim would be time-barred.

For a Title VII discrimination claim to be timely, a plaintiff must file a charge of discrimination with the EEOC (or state or local equivalent agency) within 300 days of the alleged discriminatory act. *See* 42 U.S.C. § 2000e–5(e)(1); *Hill v. Citibank Corp.,* 312 F.Supp.2d 464, 472 (S.D.N.Y. 2004), "This statutory requirement effectively acts as a statute of limitations, and Title VII claims are barred by the failure to file a timely charge." *Hill,* 312 F.Supp.2d at 472. The continuing violation doctrine does not apply to "discrete discriminatory acts," which "are not actionable if time-barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (emphasis added).

"A discrete discriminatory act is a 'single completed action' that occurs at a specific time, and typically is actionable on its own." *Colon v. The S. New England Tel. Co.,* 3:09–CV–802CSH, 2009 WL 4730480, at *2 (D.Conn. Nov. 30, 2009) (quoting *Elmenayer v. ABF Freight Sys., Inc.,* 318 F.3d 130, 135 (2d Cir.2003)). *Morgan* specifically identified a failure to promote as an example of a discrete act that "starts a new clock for filing charges." 536 U.S. at 113–14, 122 S.Ct. 2061.

Here, Plaintiff filed her charge of gender discrimination with the EEOC on September 23, 2008. Taking the tolling agreement between the parties into account, (Huggins Aff. Ex. 32), any claims under Title VII for discrete acts of alleged discrimination that occurred prior to June 17, 2007 must be dismissed as time-barred.

Although Plaintiff never applied for a promotion, her "failure to automatically promote" claim would be time-barred, because Plaintiff's contention is that she should have been promoted in 2002, after she had spent two years in her role as a full-time Instructor. This "failure" would be untimely because it occurred well before June 17, 2007.

Plaintiff's claim against Defendants for failure to "automatically" promote her in 2002 would also be untimely under the NYSHRL, the NYCHRL, and § 1981. The statute of limitations for claims brought under the NYSHRL and NYCHRL is three years, which may be tolled by the filing of a charge with the EEOC. *See* C.P.L.R. § 214; N.Y. City Admin. Code § 8–502(d); *Siddiqi v. N.Y.C. Health & Hosp. Corp.,* 572 F.Supp.2d 353, 373 (S.D.N.Y.2008). The statute of limitations for claims brought under § 1981 is four years. *Jimenez v. City of New York,* 605 F.Supp.2d 485, 500 (S.D.N.Y.2009). Thus, Plaintiffs "failure to automatically promote claim" would be untimely under

the NYSHRL and NYCHRL—because it occurred before April 12, 2005 (factoring in the parties' tolling agreement)—and § 1981—because the alleged acts of discrimination occurred before June 2, 2006, four years before she filed her complaint in this action.[5]

Therefore, Defendants' motion for summary judgment on Plaintiffs failure to promote claim is GRANTED.

## IV. Plaintiff's Retaliation Claims Fail Because Plaintiff has Failed to Raise a Genuine Issue of Fact Concerning Whether She was Retaliated Against Because of Her Protected Activities

Plaintiff also claims that Defendants retaliated against her for complaining about her treatment.

Title VII makes it unlawful "for an employer to discriminate against any of [its] employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter...." 42 U.S.C. § 2000e–3(a). Retaliation claims, like discrimination claims, are subject to the *McDonnell Douglas* burden-shifting analysis. *Lee,* 2010 WL 743948, at *11. In order to state a prima facie case of unlawful retaliation under Title VII and the NYSHRL, a plaintiff must adduce evidence sufficient to permit a rational trier of fact to find:

(1) that [s]he engaged in protected [activity] under [the antidiscrimination statutes], (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory

motive played a part in the adverse employment action.

*Fincher v. Depository Trust and Clearing Corp.,* 604 F.3d 712, 720 (2d Cir.2010) (quoting *Kessler v. Westchester Cnt'y Dep't of Soc. Servs.,* 461 F.3d 199, 205–06 (2d Cir.2006)); *see also Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 609 (2d Cir.2006) ("Retaliation claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII.") (citing cases).

The "retaliation inquiry under the NYCHRL is 'broader' than its federal counterpart," however. *Fincher,* 604 F.3d at 723. Under the NYCHRL, a plaintiff need not prove any " 'adverse' employment action," but must instead "prove that something happened that would be reasonably likely to deter a person from engaging in protected activity." *Jimenez v. City of New York,* 605 F.Supp.2d 485, 528 (S.D.N.Y.2009).

"If the plaintiff meets this burden [of establishing a prima facie case] and the defendant then points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational fact finder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 216 (2d Cir.2001).

Here, Plaintiff has established that she engaged in protected activity, but her claims fail because she has not raised a genuine issue of fact concerning whether she suffered any adverse action *because of* her protected activities. Therefore, Plaintiff's retaliation claims must be dismissed.

---

5. Because Plaintiff did not allege race discrimination in her EEOC Complaint, the filing of that complaint would not toll the statute of limitations as to her race claims under the NYSHRL and NYCHRL. Thus, any claim of race discrimination under the NYSHRL and NYCHRL prior to June 2, 2007 would be time-barred.

### A. Plaintiff Engaged in Two Instances of Protected Activity

Here, it is clear that Plaintiff has satisfied the first two prongs of the prima facie standard with respect to her retaliation claim.

Plaintiff contends that the following was sufficient to put Defendants on notice that Plaintiff's complaints about Dr. Marshall were based on her race and sex:

■ Plaintiff is the only African–American Female dentist within the Morningside Dental facility. (IDB Tr. 288:16);

■ Plaintiff testified ... that she informed Defendant Lichtenthal that she was being treated unfairly because she was a minority. (IDB Tr. 127:17–18); and

■ She informed Defendant Bollinger that the April 18, 2007 Incident that occurred between herself and a male supervisor was demeaning.

(Opp'n at 14.)

■ "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores*, 202 F.3d 560, 566 (2d Cir.2000). "Opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection." *Id.* at 566. "The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including complaints to management." *La Grande v. DeCrescente Dist. Co., Inc.*, 370 Fed.Appx. 206, 212 (2d Cir.2010).

■ Plaintiff has produced sufficient evidence to support a prima facie case that she engaged in two instances of protected activity: (1) her June 18, 2007 complaint to Dr. Lichtenthal; and (2) her EEOC Complaint. Plaintiffs June 18, 2007 statement to Dr. Lichtenthal that she believes she was being treated unfairly because she is a minority can clearly be understood to have been about her race, and possibly her gender. Defendants concede as much. (Reply at 7 (Plaintiff's allegation about her conversation with Dr. Lichtenthal "would constitute protected activity").) It goes without saying that her September 23, 2008 EEOC Complaint is protected activity.

Plaintiff's other claims—and potential claims—of protected activity are without merit, however, because they could not have been understood by management to have been about Plaintiff's race or gender. A report against a supervisor is only protected activity if "the report can be fairly understood as asserting a claim of prohibited discrimination." *Lee*, 2010 WL 743948, at *11. Defendants "cannot be charged with knowing about an instance of discrimination if [they were] never told that there was any racial [or gender] aspect to the situation." *Lee*, 2010 WL 743948, at *12.

Before her statement to Dr. Lichtenthal on June 18, 2007, there is no evidence that Plaintiff ever suggested to anyone that she was complaining about gender or race discrimination. Plaintiff's April 2007 complaint to Dr. Bollinger and Dr. Goldman did not include a single reference to her race or gender, or in any way indicate that she felt that Dr. Marshall's actions were discriminatory. (Huggins Aff. Ex. 11 (Plaintiffs letter to Dr. Bollinger and Dr. Goldman, dated April 30, 2007).) Plaintiff admitted as much in her deposition. (IDB Tr. 225:24–226:12.) Plaintiff also stated that her conversation with Dr. Lamster regarding her April 2007 complaint never included any discussion of discrimination of any sort. (IDB Tr. 77:11–22). Dr. Lamster's letter recounting that discussion also contained no reference to or mention of any discriminatory conduct. (Huggins Aff. Ex. 14.) Not even the March 31, 2008 letter from Plaintiff's lawyers to Dr. Bol-

linger contained anything that Defendants could have understood to concern Plaintiff's gender or race. (*See* Huggins Aff. Ex. 31.)

Therefore, any retaliation could only be legally cognizable if it occurred in response to either Plaintiff's complaint to Dr. Lichtenthal or Plaintiffs EEOC Complaint on September 23, 2008.

**B. Plaintiff has Failed to Raise a Genuine Issue That She Suffered any Retaliatory Actions *Because of Her* Protected Activity**

Even if I assume that Plaintiff has adequately alleged that she suffered from adverse employment actions, Plaintiff has failed to establish her prima facie case for retaliation because she has not established a causal connection between Plaintiff's protected activities and those adverse employment actions.

■ In order to satisfy the causation prong, "a plaintiff must show both that [1] the retaliator knew of the plaintiff's protected activity *and* [2] that the activity itself was a motivating cause for adverse employment action." *McKenzie v. Gibson,* No. 07 Civ. 6714(WHP), 2010 WL 3528922, at *8 (S.D.N.Y. Aug. 24, 2010) (emphasis in original); *see also Sundaram v. Brookhaven Nat. Labs.,* 424 F.Supp.2d 545, 584 (E.D.N.Y.2006); *Laurin v. Pokoik,* No. 02 Civ.1938 (LMM), 2005 WL 911429, at *5 (S.D.N.Y. April 18, 2005). Causation can be proved either: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant." *Raniola v. Bratton,* 243 F.3d 610, 625 (2d Cir.2001) (quoting *Gordon v. N.Y.C. Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir.2000)). Causation

can also be proved indirectly by demonstrating that the decisionmaker was "acting explicitly or implicit[ly] upon the orders of a superior who has the requisite knowledge." *Gordon,* 232 F.3d at 117. "Even though a plaintiff's obligation to establish a prima facie case is de minimis, when the record is bereft of a factual nexus linking the protected activity and the retaliation, summary judgment is appropriate." *See McKenzie,* 2010 WL 3528922, at *9.

■ Here, even assuming that Defendants took adverse actions against Plaintiff, Plaintiff has failed to establish a prima facie case for retaliation because she has not adduced any evidence that a causal connection exists between the protected activity and the adverse action. While Plaintiff has proffered a long list of supposed adverse actions, Plaintiff has not offered any direct evidence of retaliatory animus against her by or on behalf of defendants. Plaintiff has also failed to present even circumstantial evidence regarding: (1) the decisionmakers'—i.e., those that took the adverse actions against Plaintiff—knowledge of Plaintiffs protected activities; (2) disparate treatment of similarly situated employees from which a reasonable jury could find a retaliatory animus on the part of defendants; or (3) that someone with knowledge of Plaintiffs protected activity either implicitly or explicitly ordered anyone to retaliate against Plaintiff.

Plaintiff alleges that she suffered from several adverse retaliatory employment actions:

(i) Defendant Marshall came into the private office where Plaintiff was alone and threw paper at her, yelled at her and intimidated her a mere six weeks after her initial complaint to the University in April 2007;

(ii) Defendants Bollinger, Lamster, Lichtenthal, and Goldman failed to respond to Plaintiff's complaint in a timely manner, and took no corrective measures to discontinue the illegal behaviors suffered by Plaintiff;

(iii) Defendant Marshall falsely accused Plaintiff of vacation policy violations and began what can only be considered a witch hunt regarding Plaintiffs attendance in 2007 and continuing through 2008;

(iv) Defendant Marshall repeatedly requested that Plaintiff be transferred to another facility in 2008;

(v) Defendants failed to promote Plaintiff to Associate professor until July 2008, despite the promotion of junior non-African American and/or male colleagues;

(vi) Dr. Raquel Silvera harassed and yelled at Plaintiff regarding the use of a desk in the private office in 2009;

(vii) Dr. Raquel Silvera harassed and humiliated Plaintiff regarding the use of the computer in the private office causing Plaintiff's blood pressure to sky rocket, dizziness, and causing Plaintiff to cancel her patients for the rest of the day in January 2010; and finally,

(viii) even after Plaintiff was finally promoted in 2008, her promotion was not reflected on the Defendants' website until after Plaintiffs deposition in 2010, which negatively affected the total number of patients seen by Plaintiff for two years.

(Opp'n at 12–13.) I discuss each in turn below.

### a. The June 6, 2007 Incident

First, Plaintiff complains that Dr. Marshall "threw paper at her, yelled at her and intimidated her" in response to her complaint to Columbia in April 2007. (Opp'n at 12–13.)

However, only an "adverse action" that occurred after June 17, 2007—Plaintiffs first instance of protected activity—can support Plaintiff's retaliation claim. *See Almendral v. N.Y.S. Office of Mental Health*, 568 F.Supp. 571, 576 (S.D.N.Y. 1983), *aff'd in relevant part*, 743 F.2d 963 (2d Cir.1984) (dismissing retaliation claim when supervisor's poor evaluation was prepared before supervisor knew that plaintiff had filed a discrimination charge). A jury could not find that Dr. Marshall threw a piece of paper in retaliation for Plaintiffs protected activity.

In any event, Plaintiff could not use this incident to support a Title VII retaliation claim because, as discussed above, it occurred before June 17, 2007, and is thus time-barred.

### b. Failure to Address Plaintiff's Complaints

Plaintiff's second allegation, that Defendants did not respond to her April 2007 complaint in a timely manner, (Opp'n at 13), is irrelevant, conclusory and has no support in the record. To the contrary, the record shows that Defendants responded to Plaintiff's April 30, 2007 letter to Dr. Bollinger—which I have already held is not protected activity because it makes no mention of discrimination—before June 17, 2007. Dr. Lamster testified that he spoke with Dr. Marshall "at length" about Dr. Marshall's behavior prior to May 22, 2007. (Lamster Tr. 50:12–21; see also Huggins Aff. Ex. 14.) Plaintiff admits that her complaint was in fact investigated, and responsive actions were taken by May 22, 2007. (IDB Tr. 75:24–76:3, 153:19–154:4; Lamster Tr. 50:12–21; Huggins Aff. Ex. 14.) "The fact that management did not deal with the incident in the way that plaintiff preferred ... does not make her work environment 'hostile' as required by law." *Lee*, 2010 WL 743948, at *9. "Title VII confers on a plaintiff no

right to choose the remedy to end the harassment or demand that a workplace dispute be resolved in the way that is most attractive to her." *Id.* Title VII only requires that the employer's remedy be reasonably calculated to eliminate the hostile work environment. *See Murray v. NYU Coll. of Dentistry,* 57 F.3d 243, 250 (2d Cir.1995).

Furthermore, because the complaint and Defendants' response all occurred *before* Plaintiff first engaged in protected activity, it fails to satisfy the causation prong.

Because it occurred outside the relevant limitations periods, it also is time-barred under Title VII and the NYSHRL and NYCHRL (to the extent it is premised on Plaintiff's race).

### c. The Attendance Flap

Next, Plaintiff asserts that Dr. Marshall "falsely accused Plaintiff of vacation policy violations and began what can only be considered a witch hunt regarding Plaintiff's attendance in 2007 and continuing through 2008." (Opp'n at 13.) Plaintiff, however, has failed to offer any evidence— just her "opinion," (IDB Tr. 296:13–18)— that Dr. Marshall accused Plaintiff of attendance violations *as a result of* Plaintiff's protected activity. The evidence instead shows that Dr. Marshall was first tasked with providing an accounting of the vacation days used by faculty members at all faculty practices in April 2007. (Marshall Tr. 66:13–17; Marshall Decl. Ex. C; Defs.' 56.1 Statement ¶ 64.) Thus, even if the investigation could be considered an adverse action, the initiation of the investigation preceded Plaintiff's first protected activity, her June 17, 2007 complaint.

Plaintiff does accuse Dr. Marshall of fabricating Plaintiff's time sheet, which might postdate Plaintiffs protected activities: "When Dr. Marshall and his colleagues were unable to find a reason to have me terminated, Dr. Marshall fabricated, fabricated my time sheet." (IDB Tr.

118:14–17.) But Plaintiff neither specifies when it happened, nor provides any evidence to support this conclusory allegation. For example, Plaintiff does not explain which time sheet entries are false, let alone provide any evidence that could show their inaccuracy. Thus, her vague, general accusation does not raise a genuine issue of material fact.

Even if evidence of causation were present, and Plaintiff had made out a prima facie case of retaliation, her claim would still fail. Under the *McDonnell Douglas* regime, "After a plaintiff makes a prima facie case, the burden shifts to the [d]efendants to provide a legitimate, nondiscriminatory reason for the adverse employment action experienced by Plaintiff." *Hill,* 467 F.Supp.2d at 357 n. 24. Here, Defendants have offered a legitimate, non-discriminatory reason for their conduct: that Dr. Marshall was specifically tasked with providing an accounting of employees' use of vacation days for the 2006–2007 academic year, and that he believed he found discrepancies in Plaintiffs reporting of her vacation days.

Plaintiff then would be required to show, with admissible evidence, that a rational jury could conclude that this facially legitimate, non-discriminatory policy was a pretext for discrimination. *Id.* at 365. Plaintiff has not offered any such evidence. The evidence shows that Dr. Marshall was given this responsibility after the 2006–2007 academic year was already underway—before Plaintiff first engaged in protected activity—and did not have a complete record of all requests for time off that had been made by faculty. (Defs.' 56.1 Statement ¶ 67.) To complete his assignment, Dr. Marshall had to identify on which days faculty members were not in the practice. (*Id.* ¶ 68.) Dr. Marshall was carrying out this assigned task when questioning Plaintiff about her vacation days.

Plaintiff does not offer any evidence that Dr. Marshall treated her any differently than other employees while carrying out this task, or anything that would make Dr. Marshall's assignment, or his execution of it, appear to be pretext. Thus, no reasonable jury could find that Dr. Marshall's search for all practice members' vacation days was pretextual.

### d. The Transfer Request

■ Next, Plaintiff alleges that Dr. Marshall "repeatedly requested that Plaintiff be transferred to another facility in 2008." (Opp'n at 13.) Dr. Lichtenthal testified at his deposition that Dr. Marshall asked Dr. Lichtenthal to reassign Plaintiff on one occasion. (Lichtenthal Tr. 33:9–21.) The record does not contain evidence that reflects *when* Dr. Marshall made his request, which would be needed for a finder of fact to infer causation based on the proximity of the request to the protected activity. (*See id.*)

Furthermore, there is no evidence that Dr. Marshall's alleged requests to transfer Plaintiff were related to Plaintiff's protected activities. Indeed, there is no evidence in the record that Dr. Marshall was aware of Plaintiffs protected activities, and Plaintiff offers no evidence from which the Court can infer such knowledge.

Even if Plaintiff could prove that Dr. Marshall was aware of her protected activity when he made his transfer request, and thus make her prima facie case, Plaintiff has failed to meet her burden under *McDonnell Douglas.* Defendants have offered a legitimate, non-discriminatory reason for this request. Dr. Lichtenthal, in addition to confirming that Dr. Marshall requested Plaintiff's transfer on one unspecified occasion, stated that Dr. Marshall made this request because Plaintiff would neither communicate nor meet with him, rendering which inhibited his ability to do his job effectively. (Lichtenthal Tr. 33:13–

21.) Plaintiff failed to respond to this, and offered no evidence that this facially legitimate, non-discriminatory policy was a pretext for discrimination.

### e. Failure to Promote

Defendants' failure to promote Plaintiff until July 2008 is not an adverse action under any of the three statutes, for the reasons discussed above. Furthermore, the fact that she was promoted *after* she first engaged in protected activity fatally undermines her arguments.

### f. Dr. Silvera's Actions

■ Plaintiff also asserts that the mistreatment she suffered at Dr. Silvera's hands in August 2009 and January 2010 was retaliatory, (Opp'n at 13.) However, because the record contains neither direct nor indirect evidence that Dr. Silvera was aware of any protected activity. Plaintiff did not allege that Dr. Silvera was aware of Plaintiffs complaints, (*see* IDB Tr. 278:17–279:14), and the Court could not find any support in its review of the record. Plaintiff also does not offer any evidence that Dr. Silvera was "acting explicitly or implicitly upon the orders of a superior who [had] the requisite knowledge." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir.2000).

Thus, Plaintiff may rely only upon temporal proximity. "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citing *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir.2001)). The earliest two incidents between Plaintiff and Dr. Silvera occurred on August 18, 2009, approximately eleven months after

Plaintiff filed her EEOC Complaint on September 23.2008. This 11 month gap is too long to allow for an inference of causation without any other evidence. *See Murray v. Visiting Nurse Servs.,* 528 F.Supp.2d 257, 275 (S.D.N.Y.2007) (temporal gap of two-three months, "without more, does not allow for an inference of causation"); *Pellegrino v. County of Orange,* 313 F.Supp.2d 303, 317 (S.D.N.Y. 2004) (four month temporal gap "is considered quite weak temporal correlation in this Circuit."); *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997) (three month period insufficient); *Hughes v. Derwinski,* 967 F.2d 1168, 1174–1175 (7th Cir. 1992) (four month period insufficient).

### g. The Failure to List Plaintiffs 2008 Promotion on Columbia's Website

Plaintiffs claim that the failure to list her promotion on Defendants' website was retaliatory also lacks merit. Plaintiff offers no evidence, direct or indirect, that the omission of her promotion on the website occurred because of her protected activities. Plaintiff does not even identify who was or is in charge of maintaining Defendants' website and keeping its contents current. Even if this could somehow be considered an "adverse action" (which is doubtful), Plaintiff still fails to make her prima facie case for retaliation because she has not established that the mysterious decisionmaker who failed to update the website was either aware of Plaintiff's protected activities, or was instructed not to update the website by someone who was. *See Laurin,* 2005 WL 911429, at *5.

\* \* \*

In sum, Plaintiff failed to raise a genuine issue of fact concerning whether she suffered any retaliatory action *because of* her protected activities. Therefore, Defendant's motion for summary judgment on Plaintiff's retaliation claims is GRANTED.

### V. Plaintiff's Claims Against the Individual Defendants Fail as a Matter of Law

Plaintiff seeks to hold Drs. Bollinger, Lamster, Lichtenthal, Marshall, and Goldman individually liable for discrimination and retaliation against her under Title VII, the NYSHRL, the NYCHRL, and § 1981.

It is well settled that there is no individual liability under Title VII. *Lore v. City of Syracuse,* 670 F.3d 127, 169 (2d Cir.2012) ("Title VII does not impose liability on individuals"). Therefore, all of Plaintiff s Title VII claims against the individual defendants must be dismissed.

Unlike Title VII, the NYSHRL provides for the imposition of liability on individual defendants under two of its provisions: §§ 296(1) and 296(6), "Individual liability under § 296(1) lies only where a defendant actually participates in the conduct giving rise to discrimination, and is limited to individuals with ownership interest or supervisors, who themselves have the authority to hire and fire employees." *Hubbard v. No Parking Today, Inc.,* No. 08 Civ. 7228(DAB), 2010 WL 3835034, at *10 (S.D.N.Y. Sept. 22, 2010) (internal citations and quotation marks omitted). Section 296(6) of the NYSHRL provides for "aiding and abetting" § 296(1)(a) violations, explaining that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article or to attempt to do so." *Id.* (quoting N.Y. Exec. Law § 296(6)). To be found liable under § 296(6), an individual need not have supervisory or hiring and firing power, but still must have "actually participated in the conduct giving rise to the claim of discrimination." *Id.* Since the NYCHRL and NYSHRL use virtually identical language, claims for individual liability under both statutes are subject to the same analysis.

*See Schanfield v. Sojitz Corp., Of Am.,* 663 F.Supp.2d 305, 344 (S.D.N.Y.2009).

■ Plaintiff also seeks to hold the individual defendants liable under § 1981. Under § 1981, to establish personal liability of a defendant, "It must be shown that the defendant had personal involvement in the allegedly discriminatory conduct in order for personal liability to attach." *Schanfield,* 663 F.Supp.2d at 344.

■ "However, liability under the [NY]HRL and the NYCHRL must first be established as to the employer/principal before an individual may be considered an aider and abettor." *Sowemimo v. D.A.O.R. Sec., Inc.,* 43 F.Supp.2d 477, 490 (S.D.N.Y.1999); *see also Jain v. McGraw–Hill Cos., Inc.,* 827 F.Supp.2d 272, 276–77, 2011 WL 5120261, *3 (S.D.N.Y. Oct. 28, 2011). Since the NYSHRL and the NYCHRL claim are not viable against Plaintiffs employer, they are not viable against the individual defendants.

Here, for the reasons discussed above, Plaintiff has failed to establish any actionable employer discrimination. There is simply no employer liability in this case that the individual defendants could have participated in or aided and abetted. Therefore, the individual defendants are also entitled to summary judgment on Plaintiffs NYSHRL, NYCHRL, and § 1981 claims.

## VI. Plaintiff has Abandoned her Claims for Negligent and Intentional Infliction of Emotional Distress

Plaintiff has not opposed Defendants' motion with respect to her claims for negligent and intentional infliction of emotional distress. "This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." *Lipton v. Cnty. of Orange, N.Y.,* 315 F.Supp.2d 434, 446 (S.D.N.Y.2004) (citing cases); *see also S.E.C. v. Kelly,* 765 F.Supp.2d 301, 323 (S.D.N.Y.2011) (McMahon, J.) (dismissing cause of action as abandoned where party failed to respond to movant's arguments for summary judgment in its opposition); *Marache v. Akzo Nobel Coatings, Inc.,* No. 08 Civ. 11049, 2010 WL 3731124, at *2 (S.D.N.Y. Sept. 7, 2010) (granting summary judgment because plaintiff abandoned claim by "failing to respond or even mention [the] claim" in his opposition brief to defendant's motion).

Accordingly, Defendants' motion for summary judgment dismissing Plaintiffs claims for negligent and intentional infliction of emotional distress is GRANTED.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED, and the complaint is dismissed.

The Clerk is instructed to remove the motion at ECF No. 19 from the Court's list of open motions, and to terminate the case.